******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

McDONALD, J., dissenting. In *State* v. *Guilbert*, 306 Conn. 218, 259–60, 49 A.3d 705 (2012), we explained that the "identification of a person who is *well-known* to the eyewitness generally does not give rise to the same risk of misidentification as does the identification of a person who is *not well-known* to the eyewitness." (Emphasis added.) In that case, we concluded that four of the five eyewitnesses "were *familiar enough* with the defendant that the risk of misidentification was small" so as to render the trial court's decision to preclude expert testimony on misidentification not an abuse of discretion as to those witnesses. (Emphasis added.) Id., 261. I agree with the majority that this court should not prescribe a bright line rule regarding a specific number of encounters or the nature of the exposure that an eyewitness must have with the person whom she identifies as the perpetrator to constitute the requisite familiarity. Indeed, it would be difficult to know precisely where to draw such a line. See *Haliym* v. *Mitchell*, 492 F.3d 680, 706 (6th Cir. 2007) ("[w]itnesses are very likely to recognize under any circumstance the people in their lives with whom they are most familiar, and any prior acquaintance with another person substantially increases the likelihood of an accurate identification"). It does seem to me, however, that the record must clearly demonstrate that the eyewitness has sufficient familiarity as to give us confidence that the inherent dangers of eyewitness identification are unlikely to be present. No such record exists in the present case.

The trial court made no finding regarding the extent to which Marlyn DeJesus, the sole eyewitness to the robbery of the Overstock Outlet store (store), was familiar with the defendant, Stanley Williams. In fact, there is no mention at all of this factor in the court's oral ruling precluding the defendant's expert on the accuracy of eyewitness identification. The trial court, of course, lacked the benefit of our decision in *Guilbert*, as well as Justice Palmer's concurrence in *State* v. *Outing*, 298 Conn. 34, 101, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011), foreshadowing the holding in *Guilbert*.

Nor is the record sufficiently clear as to permit this court to make such an assessment as a matter of law. The record reflects that DeJesus had been working at the store for only five months at the time the robbery occurred. DeJesus testified that, in those preceding five months, the perpetrator had come into the store "a couple times" before the robbery, that she "[could not] really tell you how many times," and that she could only confirm that she had seen him more than once.[1] She later described him as "a regular customer

[be]cause [she had] seen him before." With respect to those previous visits, DeJesus could not recall what the perpetrator had been wearing. Because DeJesus never identified the defendant by name in either her statement to the police or her testimony, it must be assumed that she did not know his name. Other than indicating that she had greeted him as he entered the store on the day of the robbery, as she did with all customers, DeJesus did not indicate that she and the perpetrator had ever had any face-to-face interactions, of any nature or duration, prior to the robbery. Nor is there any indication in the record regarding any of the attendant circumstances surrounding DeJesus' prior interactions with the perpetrator. Moreover, there is nothing in the record regarding how long prior to the robbery, over the preceding five months of her employment, DeJesus last encountered the perpetrator. The facts that are in the record are simply too slim, indefinite, and generalized to support a conclusion, as a matter of law, that DeJesus was "so familiar with the defendant that the risk of misidentification was insignificant." *State* v. *Guilbert*, supra, 306 Conn. 262; see also *State* v. *Outing*, supra, 298 Conn. 101 n.8 (*Palmer, J.*, concurring) ("[inherent] dangers [of eyewitness identifications] are generally limited to eyewitness identifications of strangers *or persons with whom the eyewitness is not very familiar*" [emphasis added]).

The majority acknowledges but glosses over the deficiencies in the record in the present case, concluding that the facts here are similar to those in other cases in which eyewitnesses have been deemed sufficiently familiar with the perpetrator. I respectfully disagree. In *Guilbert*, of the four eyewitnesses deemed to be sufficiently familiar with the defendant, the one who knew him *least* well "had seen the defendant as a regular customer in the donut shop where she had worked for more than one and one-half years before the shooting and knew him by name." *State* v. *Guilbert*, supra, 306 Conn. 261 n.40. With respect to the other three eyewitnesses, one had known the defendant " 'for a while' " and had " 'had words' " with him " 'a couple of months' " before the shooting, one had known the defendant for approximately ten years and knew him by name, and one previously had lived with the defendant for " 'quite some time . . . .' " Id.

In the other cases cited by the majority in which there is any basis from which we can glean the nature and extent of the eyewitnesses' familiarity with the alleged perpetrators,[2] it clearly exceeds the minimal contact in the present case. See *Parker* v. *State*, 333 Ark. 137, 147, 968 S.W.2d 592 (1998) (eyewitness had known defendant "for about ten years"); *Hager* v. *United States*, 856 A.2d 1143, 1145 (D.C. App.) (The eyewitness had seen the defendant "for well over a year . . . on a daily basis outside [the victim's] apartment building but did not know his name. She exchanged

greetings with him and heard him converse with other people."), amended on reh., 861 A.2d 601 (D.C. App. 2004), cert. denied, 547 U.S. 1035, 126 S. Ct. 1609, 164 L. Ed. 2d 325 (2006); *State* v. *Trotter*, 280 Kan. 800, 807–808, 127 P.3d 972 (2006) (child eyewitness knew defendant as friend of his father and had seen defendant in their home); *Commonwealth* v. *Stoddard*, 38 Mass. App. 45, 48, 644 N.E.2d 234 (1995) ("[T]here may be cases in which the parties are so well known to each other or so closely related that under sufficient lighting and with appropriate physical proximity, the identification by the victim is either true or the victim is lying. . . . That is the case here. The victim knew the defendant as a regular customer of the station and had encountered him numerous times over a year and one-half." [Citation omitted; internal quotation marks omitted.]); *People* v. *Abney*, 13 N.Y.3d 251, 265, 918 N.E.2d 486, 889 N.Y.S.2d 890 (2009) (eyewitness "had seen and heard [the] defendant in the neighborhood regularly over a period of six months before the robbery"); *Johnson* v. *State*, 85 Wis. 2d 22, 25–26, 270 N.W.2d 153 (1978) (one eyewitness had seen defendant "on many previous occasions, although she didn't know him personally"; another eyewitness had previously seen defendant at his family home and at family run business and had been introduced to defendant by eyewitness' uncle; and third eyewitness did not know defendant personally but had seen him on "more than" one occasion and had observed him sufficiently to testify regarding his knowledge of defendant's character and behavior, stating that defendant "would push people around if he could"); see also *Saenz* v. *Kansas*, Docket No. CIV. A. 02-3119-CM, 2003 WL 22102140, *7 (D. Kan. July 16, 2003) (eyewitness had seen defendant "at least ten times before th[e] night [of the crime]").[3]

Notably, several of the cases cited by the majority rely heavily on corroborative evidence as a basis to deem eyewitness testimony sufficiently reliable, or did not turn on concerns of misidentification. See, e.g., *People* v. *Abney*, supra, 13 N.Y.S.3d 269 (not abuse of discretion to exclude expert testimony on reliability of eyewitness identifications because this was "not a case [that] turn[ed] on the accuracy of eyewitness identifications [where] there [was] little or no corroborating evidence connecting the defendant to the crime" [internal quotation marks omitted]); *People* v. *Perez*, 85 App. Div. 3d 630, 925 N.Y.S.2d 501 ("The case did not turn on the accuracy of an eyewitness identification, and there was extensive corroborating evidence . . . . One of the two identifying witnesses was acquainted with [the] defendant. As to this witness, the issue was credibility, not mistaken identity. Furthermore, there was additional corroborating evidence . . . ." [Citations omitted.]), appeal denied, 17 N.Y.S.3d 955, 959 N.E.2d 1030, 936 N.Y.S.2d 81 (2011); *United States* v. *Wiley*, 545 Fed. Appx. 598, 599 (9th Cir. 2013) (noting that eyewitness

had seen defendant "several times before," eyewitness had been subject to cross-examination, court gave comprehensive instruction on eyewitness testimony, and defendant's coconspirator had identified defendant in surveillance video of robbery). In *Guilbert*, we expressly rejected corroborative evidence of the defendant's guilt as relevant to the trial court's exercise of discretion in admitting expert testimony on this matter. *State* v. *Guilbert*, supra, 306 Conn. 263.

The majority contends that I improperly "presume from the lack of definitive evidence as to the specifics of the defendant's previous visits to the . . . store that those visits were minimal in number and that he and DeJesus had never spoken or otherwise interacted prior to the day of the robbery." See footnote 17 of the majority opinion. I make no such presumption. Rather, I simply conclude that, *because there is no such evidence*, we cannot infer that there *were* numerous visits or such interactions. Even reading a record to support a trial court's ruling does not permit us to draw inferences unsupported by any evidence. The record unambiguously establishes that DeJesus had seen the perpetrator more than once, but that she was unable to identify how many more times. The only other specific information she gave was consistent with that statement—"a couple times." Although DeJesus' testimony leaves open the *possibility* that she could have seen him on more than two occasions prior to the robbery, it would be pure speculation to conclude that she had. The majority's emphasis on DeJesus' single reference to the perpetrator as a "regular customer" takes that description entirely out of context, ignoring that this statement followed her answers to the preceding questions and that she explained exactly what she meant: he was "a regular customer *cause I have seen him before.*"[4] (Emphasis added.) Thus, this description cannot reasonably be construed to expand her prior, specific testimony. In my view, this simply is not enough to render the risk of misidentification slim.

The majority also contends that the omissions in the record inure to the detriment of the defendant because he had the burden of establishing that DeJesus was *not* sufficiently familiar with the perpetrator. I disagree. The state moved to preclude the defendant's expert on eyewitness identification; therefore, as the moving party, it had the burden of proof. Cf. *Menna* v. *Jaiman*, 80 Conn. App. 131, 138 n.4, 832 A.2d 1219 (2003) ("[t]he party who files the motion in limine has the burden of demonstrating that the evidence is inadmissible on any relevant ground"); see also *State* v. *Binet*, 192 Conn. 618, 624, 473 A.2d 1200 (1984) (defendant failed to sustain burden on his motion in limine). Indeed, even if the defendant had an initial burden of demonstrating that the expert's testimony on eyewitness identification would be useful and relevant to the jury because the circumstances of the identification implicated one or

more of the concerns identified in *Guilbert*, once the defendant met this burden, the burden should shift to the state to prove that the risk of misidentification is not great because of the eyewitness' familiarity with the defendant. See *State* v. *Guilbert*, supra, 306 Conn. 259–63 (examining state's claim that eyewitnesses knew defendant and therefore risk of misidentification was less likely).

I note that an amicus brief was submitted in *Guilbert*, in which studies were presented in support of the proposition that there is a danger of misidentification even when the eyewitness has some familiarity with the person who is identified. Id., 261 n.41. The studies reflected that eyewitnesses who had interacted with strangers for longer periods were more prone to misidentification when presented with a photographic array. Id. Although we noted the absence of any reason to question the scientific validity of these studies, we concluded that they had little relevance in the case before us because the defendant was well-known before the crimes to all but one of the eyewitnesses, and all of those eyewitnesses had identified the defendant as the shooter before being presented with a photographic array. Id. In light of the outcome in the present case, perhaps this scientific evidence deserves further scrutiny.

On the basis of the record in this case, I would conclude that the trial court, having made no findings of fact regarding the nature and extent of DeJesus' familiarity with the perpetrator, abused its discretion in precluding the defendant from introducing expert testimony on the risks of misidentification. Indeed, several of the factors we had identified in *Guilbert* clearly are implicated in the present case—the eyewitness' confidence in her identification; the eyewitness' focus on a weapon; the eyewitness' high stress at the time of observation; and the perpetrator's wearing of a hat.[5] See id., 237–39; id., 239 n.20. To the extent that the majority relies on the fact that DeJesus stated that she recognized the perpetrator when he entered the store, *before* he threatened her with the knife, her testimony also unambiguously indicates that she was distracted at that time. DeJesus acknowledged that she had been looking at her laptop computer before and after the perpetrator entered the store and that she had not paid attention to him after he walked past her. She further acknowledged that the videotape of the incident reflected that her hand continued to navigate the laptop touch pad before, *during*, and after the perpetrator entered the store. She also indicated that, when the perpetrator came to the cash register, she did not look at his face until she had completed ringing up his items, at which time he drew out the knife.

I would further conclude that, under these circumstances, the trial court's decision to preclude expert testimony was harmful error. See id., 265 (citing stan-

dard for reversal based on improper evidentiary ruling of nonconstitutional nature). The state's case in the store robbery turned on the jury crediting DeJesus' identification. Indeed, because the eyewitness to the earlier liquor store robbery could not identify the defendant as the perpetrator, DeJesus' identification had paramount significance. As we explained in *Guilbert,* "the methods traditionally employed for alerting juries to the fallibility of eyewitness identifications—cross-examination, closing argument and generalized jury instructions on the subject—frequently are not adequate to inform them of the factors affecting the reliability of such identifications. . . . [A]lthough cross-examination may expose the existence of factors that undermine the accuracy of eyewitness identifications, it cannot effectively educate the jury about the import of these factors. . . . Defense counsel's closing argument to the jury that an eyewitness identification is unreliable also is an inadequate substitute for expert testimony. In the absence of evidentiary support, such an argument is likely to be viewed as little more than partisan rhetoric." (Citation omitted; emphasis omitted; footnotes omitted.) Id., 243–44.

Accordingly, I respectfully dissent.

[1] In her signed statement to the police, DeJesus simply informed them that she "ha[d] seen [him] in the store before."

[2] Several cases simply state in conclusory fashion that an eyewitness "knew" the defendant. See, e.g., *People* v. *Pacheco*, 38 App. Div. 3d 686, 688, 832 N.Y.S.2d 248 ("identifying witness knew the defendant for months"), appeal denied, 9 N.Y.3d 849, 872 N.E.2d 888, 840 N.Y.S.2d 775 (2007).

[3] The majority cites *State* v. *Saenz*, 271 Kan. 339, 354, 22 P.3d 151 (2001), which does not indicate the extent of the interaction between the defendant and the eyewitness. The federal habeas court decision I have cited is related to this case.

[4] To put this phrase in its proper context, I note the following exchange that ensued when defense counsel cross-examined DeJesus with respect to the events on the day of the robbery:

"[Defense Counsel]: Were you thinking to yourself, I really want to get a good look at this man because I may have to identify him later today?

"[DeJesus]: No.

"[Defense Counsel]: He was just another customer as he was walking in, right, as far as you knew?

"[DeJesus]: Yes. He was a regular customer cause I have seen him before."

[5] The trial court found that the defendant had not established that the eyewitness identification was cross-racial, only that the defendant is black and that DeJesus has a Hispanic last name. I do not read the majority's opinion to necessarily compel the same result if a defendant has established this fact.

———————————————